

2016 DEC 20  AM 9: 37

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA, EX REL. SHARON DILL** and **CHRISTINA SIEVERT**, | **CIVIL ACTION** |
| Plaintiffs, | **Case No. 2:16-cv-87** |
| v. | **Judge: Unassigned** |
| **FLORIDA CANCER SPECIALISTS, P.L.**, a Florida professional limited liability company, **DR. WILLIAM N. HARWIN**, an individual, **21st CENTURY ONCOLOGY, LLC**, a Florida limited liability company, **DR. DANIEL DOSORETZ**, an individual, and several unknown physicians, | **Mag. Judge:  Mac R. McCoy**<br><br>**FILED IN CAMERA AND UNDER SEAL** |
| Defendants. |  |

## AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE QUI TAM PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE AND DEMAND FOR JURY TRIAL

NOW COME the Relators, **SHARON DILL** ("Dill") and **CHRISTINA SIEVERT** ("Sievert") (collectively "Relators"), by and through undersigned counsel, on behalf of the United States of America ("United States") and brings this action against Florida Cancer Specialists, P.L. ("FCS"), Dr. William N. Harwin ("Harwin"), 21st Century Oncology, LLC ("21C"), Dr. Daniel Dosoretz ("Dosoretz") and several unknown physicians (collectively "Defendants"), under the False Claims Act, 21 U.S.C. §3729 et. seq. ("FCA") and the federal Anti-Kickback Statute (42 U.S.C. ¶1320a-7b(b), and in support of the Amended Complaint, Relators allege as follows:



## INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States against the Defendant for submitting and causing to be submitted false claims to the United States under the government healthcare program, Medicare and Medicaid ("Program"), from the past six (6) years through present ("Relevant Period").

2.      During the Relevant Period, Defendants have fraudulently and systematically submitted and/or caused to be submitted false claims to receive monies from the Program knowing of the falsity of such claim and the false and fraudulent misrepresentations contained therein, and have also engaged in practices that violate the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, by engaging in anticompetitive practices that involve the trading of Program patients as commodities, which is an illegal *quid pro quo* kickback scheme.

3.      During the Relevant Period, Defendants have received monies from the Program as a direct and proximate result of its fraudulent claims submitted to the Program and the false and fraudulent misrepresentations contained therein.

4.      Defendants perpetrated these schemes in order to obtain monies from the Program for business and personal profit.

5.      This is also an action brought under Title VII of the Civil Rights Act of 1964 (Title VII) and the Florida Civil Rights Act of 1992 (FCRA) for (1) gender discrimination in violation of Title VII, (2) gender discrimination in violation of the FCRA, (3) disability discrimination in violation of the Americans with Disabilities Act (ADA), and (4) retaliation in violation of the ADA. These claims are referred to hereafter as the "Employment Claims."

### JURISDICTION AND VENUE

2

6.      These claims arise under the Qui Tam provisions of the FCA and the federal Anti-Kickback Statute. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

7.      Personal jurisdiction and venue for this action are predicated on 31 U.S.C. §3732(a) which provides: "any action brought under §3720 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by §3729 occurred." Defendants **FCS** and **21C** are entities that conduct its business in, among other places, Lee County, Florida, which is within the Middle District of Florida, Ft. Myers Division. Defendants **HARWIN** and **DOSORETZ** are domiciled within Lee County, Florida and conduct business within Lee County, Florida.

8.      Under §3720(b)(2) of the FCA, this Complaint is to be filed *In Camera* and remain under seal for a period of at least sixty (60) days, and shall not be served on the Defendant until to Court so orders. The government may elect to intervene and proceed with the Act within sixty (60) days after it receives both the Complaint and the material evidence and information.

9.      This Court has jurisdiction of the Employment Claims under 28 U.S.C. §1331.

10.     This Court has supplemental jurisdiction over the Relators' state law Employment Claims pursuant to 28 U.S.C. § 1367.

11.     Venue over the Employment Claims is proper in the United States District Court for the Middle District of Florida because the Plaintiff resides in, and the Defendant conducts business in, and some or all of the events giving rise to Plaintiff's claims occurred in Lee

County, Florida, which is within the Middle District of Florida. Venue is proper in the Fort Myers Division under Local Rule 1.02(b)(5) since Lee County is within the Fort Myers Division.

12.     Relator Dill received her Notice of Right to Sue from United States Equal Employment Opportunity Commission ("EEOC") on December 1, 2016 and the instant Complaint is filed within the time frame required under the law. A true and accurate copy of the Notice of Right to Sue is attached as Exhibit A.

13.     Relator Sievert timely filed her Charge of Discrimination with the EEOC more than 180-days prior to filing this Amended Complaint. Despite requesting the EEOC issue a Notice of Right to Sue, the EEOC has failed to do so despite Sievert's best efforts; consequently, Sievert has exhausted her administrative remedies by allowing the EEOC more than 180-days to investigate her Charge and by making demand for issuance of the Notice of Right to Sue.

<b><u>PARTIES</u></b>

14.     Relator Dill is a resident of Lee County, Florida. She worked as **FCS's** Vice President, Human Resources and Chief Human Resources Officer, January 23, 2012 to November 10, 2015.

15.     Relator Sievert is a resident of Lee County, Florida. She worked as **FCS's** Vice President of Clinical Financial Services, from October 2013 to October 1, 2015. Relator Sievert began her employment with **FCS** in October 2003.

16.     Defendant, **FLORIDA CANCER SPECIALISTS, P.L.,** is a Florida professional limited liability corporation formed in 1998 by several of the area's best-known oncologists. Prior to that, in 1984, it was formed as "Florida Cancer Specialists & Research Institute." Defendant FCS is the largest independent medical oncology/hematology practice in the United States with over 180 physicians, 130 nurse practitioners and physician assistants and over 90

4

locations in the **FCS** network. **FCS** is a full service cancer care provider that provides medical oncology and radiation oncology, though it does not provide radiation oncology on the west coast of Florida from Tampa to Marco Island.

17.     Defendant, **DR. WILLIAM N. HARWIN** is the President or "managing physician" of Defendant FCS and is a resident of Lee County, Florida.

18.     Defendant, **21ST CENTURY ONCOLOGY, LLC ("21C")** is a Florida limited liability company with a principal place of business located at 2234 Colonial Boulevard, Fort Myers, Florida 33907. **21C** is also full service cancer care provider that provides medical oncology and radiation oncology, though it does not provide medical oncology on the west coast of Florida from Tampa to Marco Island.

19.     Defendant, **DANIEL DOSORETZ ("DOSORETZ")** is an individual and former Chief Executive Officer of **21C**.

20.     Defendant Unknown Physicians are those presently unknown physicians that committed violations of the FCA during the Relevant Period.

21.     During the Relevant Period, Defendants, acting with, through and under the supervision of its highest executives and managers, fraudulently submitted and/or caused to be submitted claims to receive monies from the Program knowing of the falsity of such claims, the false and fraudulent misrepresentations contained therein and the fact that many of these claims violated the federal Anti-kickback Statute

22.     During the Relevant Period, Defendants, acting with, through and under the supervision of its highest executives and managers, received monies from the Program by fraudulent means and perpetrated schemes in order to, and did, obtain monies from the Program, distributing the same to Defendants' physicians and to the corporate Defendants despite the fact

that such monies were fraudulently obtained or obtained in violation of the Anti-Kickback Statute.

23.     The policies and procedures carried out by the Defendants in perpetrating these schemes were established and/or ratified at the highest corporate levels of Defendant **FCS**.

24.     The policies and procedures carried out by the Defendants in perpetrating these schemes were carried out by those persons holding the highest corporate levels of Defendant **FCS** and **21C**.

25.     During the Relevant Period, Defendants acted through its principals, officers, agents and employees, including **HARWIN** and **DOSORETZ**, and the acts of the Defendant **FCS's** and **21C's** principals, officers, agents and employees were within the scope of their agency and employment.

26.     As a result of their employment with Defendant **FCS**, Relators have first-hand knowledge and information regarding the business operations, fraudulent claims for Program monies paid by the Government Program and the Defendants' violations of the Anti-kickback Statute.

27.     Relators bring this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding the same, Relators are an original source for the facts alleged in this Complaint. As a result of their employment with Defendant **FCS**, Relators have first-hand knowledge of the business operations of the Defendants and their intentional and/or reckless disregard and fraudulent conduct in connection with their knowledge, supervision and direction of the illegal and fraudulent practices carried out by the Defendants.

28.     The Relators repeatedly confronted executives with Defendant **FCS** with their concerns about the fraudulent claims for Program monies and the fraudulent retention of monies fraudulently obtained by the Defendants, but to no avail.

29.     As required under the FCA, Relators have provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a statement of all of the material evidence and information relating to the Complaint ("Disclosure Statement"). The Disclosure Statement supports the existence of false claims by the Defendants.

## STATUTORY & REGULATORY BACKGROUND

### A. The False Claims Act

30.     The FCA imposes liability upon any person who (a) "knowingly presents or causes to be presented [to the Government] a false or fraudulent claim for payment or approval" or (b) "knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §3729(a)(1)(A) and (B), as amended.

31.     The FCA imposes liability not only for the intentionally false or fraudulent conduct, but also where the conduct is merely "in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A)(iii).

32.     The FCA broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property... that... is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, if the United States Government- (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse any portion of the money or property requested or demanded." 31 U.S.C. §3729(b)(2)(A).

33.     The Florida False Claims Act (FFCA) has a nearly identical definition of claim, only substituting Florida or any agency thereof for the United States. F.S. §68.082(1)(b).

**B. Anti-Kickback Statutes.**

34.     Enacted in 1972, the main purpose of the federal Anti-Kickback Statute is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.

35.     Florida Statute 817.505 prohibits "any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility."

36.     As a prerequisite to participating in federally-funded health care programs, providers expressly certify (or, through their participation in a federally-funded health care program, impliedly certify) their compliant with the federal Anti-Kickback Statute.

37.     The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

> 1)  To refer an individual to a person for the furnishing of any item or service covered under a federal health care program, or;
>
> 2)  To purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.
>
> 42 U.S.C. §1320a-7b(b)(1) and (2).

38.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. §1320a-7b(b)(1).

8

39.     Violations of the federal Anti-Kickback Statute must be knowing and willful. 42 U.S.C. §1320a-7b(b)(1). An act is willful is "the act was committed voluntarily and purposely, with the specific intent or do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 837-38 (11th Cir. 1998).

40.     The federal Anti-Kickback Statute has been interpreted to cover any arrangement where *one* purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Moreover, payments made to physicians to induce referrals, even if also intended to compensate for professional services, violate the Anti-Kickback Statute.

41.     A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000.00, imprisonment of up to five (5) years, or both. Any party convicted under the federal Anti-Kickback Statute *must* be excluded from federal health care programs for a term of at least five (5) years. This means the guilty party must not be allowed to bill Government Programs for services rendered.

42.     Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider form federal health care programs for a discretionary period, and may impose administrative sanctions of $50,000.00 per kickback violation. 42 U.S.C. §1320a-7(b).

**C.  Government Health Care Programs.**

43.     Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

9

44.    The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide healthcare to low income individuals. 42 U.S.C. §§1396-1396v. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Center for Medicare and Medicaid Services ("CMS"). States pay doctors, hospitals, pharmacies and other providers and suppliers of medical items and services according to established rates. See 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended... as medical assistance under the State plan..." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

## DEFENDANTS' FRAUDULENT SCHEMES & SUBMISSION OF FALSE CLAIMS

45.    Relator Dill was the Vice President, Human Resources and Chief Human Resources Officer of Defendant **FCS** and, as such, had access to all employee records of Defendant FCS and records of the scope of allowable duties of **FCS** employees.

46.    Relator Sievert was the Vice President of Clinic Financial Services of Defendant **FCS** and, as such, had access to all billing policies of Defendant FCS and records of instructions given to FCS employees as to billing practices.

47.    Defendant **HARWIN** is the managing physician of Defendant **FCS** and, together with Brad Prechtl (Chief Executive Officer), Todd Schonherz (Chief Operating Officer), Sarah Cevallos (Chief Revenue Cycle Officer) and Thomas Clark, Esq. (Chief Legal Officer), determined and directed the billing practices of Defendant **FCS**, particularly the policies and practices that affected the submission of fraudulent claims for receipt of Program monies.

A.    **Defendants' Submission of Claims to the Program for the Unauthorized and Illegal Services of Medical Assistants.**

48.     From the commencement of Relator Dill's employment with the Defendants, she gained knowledge of and witnessed the Defendants' submission of false claims to Medicare and Medicaid for the illegal services of medical assistants.

49.     From the commencement of Relator Sievert's employment with the Defendants, she gained knowledge of and witnessed the Defendants' submission of false claims to Medicare and Medicaid for the illegal services of medical assistants.

50.     The majority of patients at FCS have MediPorts and are Medicare recipients.

51.     MediPorts are devices installed in a patient's body that provide direct "central line access" of intravenous medications.

52.     The MediPort is surgically implanted by either a General or Vascular surgeon.

53.     Patients who have to have numerous infusions often experience problems with vein access, caused by patient dehydration (many cancer patients have a difficult time staying hydrated), shot veins, and/or medications that are caustic and are best administered through a MediPort, as it requires needle or syringe access directly into the MediPort cavity.

54.     FCS patients have their MediPorts accessed for one or more of the following reasons:

      a.  Patient has an appointment for an infusion only – no lab work or physician visit;
      b.  Patient has an appointment for an infusion with lab work. This is common for oncology patients as their lab levels often have to be evaluated to determine if they can receive chemotherapy;
      c.  Patient has an appointment for lab work only, and/or;
      d.  Patient has an appointment for a port flush only. This happens when a patient has not had their port accessed for a period of time (generally 6 or more weeks). The port is flushed with saline and heparin to insure it does not become blocked.

55.     Pursuant to F.S. §458.3485(1), a medical assistant is defined as:

11

"a professional multiskilled person dedicated to assisting in all aspects of medical practice under the direct supervision and responsibility of a physician. This practitioner assists with patient care management, executes administrative and clinical procedures, and often performs managerial and supervisory functions. Competence in the field also requires that a medical assistant adhere to ethical and legal standards of professional practice, recognize and respond to emergencies, and demonstrate professional characteristics."

56.     However, F.S. §458.3485(2) delineates that, under the supervision and responsibility of a licensed physician, a medical assistant may undertake the following duties, and only the following duties:

     a.   Performing clinical procedures, to include:

          1.  Performing aseptic procedures.
          2.  Taking vital signs.
          3.  Preparing patients for the physician's care.
          4.  Performing venipunctures and nonintravenous injections.
          5.  Observing and reporting patients' signs or symptoms.

     b.   Administering basic first aid.
     c.   Assisting with patient examinations or treatments.
     d.   Operating office medical equipment.
     e.   Collecting routine laboratory specimens as directed by the physician.
     f.   Administering medication as directed by the physician.
     g.   Performing basic laboratory procedures.
     h.   Performing office procedures including all general administrative duties required by the physician.
     i.   Performing dialysis procedures, including home dialysis.

57.     As such, F.S. §458.3485(2) allows medical assistants to perform only "nonintravenous injections."

58.     Accessing a patient's surgically implanted Mediport dramatically exceeds the level of care and services that a medical assistant is authorized to perform under Florida law.

59.     Notwithstanding the same, in the past six (6) years, **FCS** and **HARWIN** required Medical Assistants to access patient ports at most, if not all **FCS** clinic locations in the State of Florida. This was corporate policy.

12

60.    In fact, the Defendants even developed job descriptions for their medical assistants, which job descriptions specifically required the Defendants' medical assistants to access patients' surgically implanted Mediports in contravention of Florida law.

61.    The Defendants' protocol required the patient to first go to the in-house lab drawing area, which is where the Medical Assistant would access the patient's surgically implanted Mediport, draw any necessary labs and then, if scheduled, transfer the patient to the Infusion Room for the administration of their IV medication.

62.    The Defendants' clinics that are open on Saturday and Sunday frequently utilized medical assistants to access patients' surgically implanted Mediports.

63.    The Defendants' protocol further required their medical assistants to pass a "competency checklist" demonstrating that they were able to access a patient's surgically implanted Mediport.

64.    Once the Defendants' medical assistants demonstrated this competency, along with a few other tasks and responsibilities, they could be promoted to from a "Medical Assistant I" to a "Medical Assistant II" and receive a pay increase of $1.00 per hour.

65.    This is noted in the job description for Medical Assistant II, and the Performance Evaluation Form for Medical Assistant II.

66.    The issue of the safety of Medical Assistants accessing a patient's surgically implanted Mediport was first raised by the FCS Clinical Directions Team (CDT) in mid-2014.

67.    The CDT is comprised of a representative of Head Nurses, Director Compliance, Director EMR, and other members of Operational Management.

68.    The CDT is chaired by Diane Cope, PhD, ARNP-BC, AOCNP.  Ms. Cope reports directly to **HARWIN**.

13

69. Ms. Cope was concerned that this practice may not be clinically safe, nor permissible under Florida Nurse Practice Statutes.

70. She and her committee members discussed with members of FCS Operations Management, including Jeremy Behling, VP Operations.

71. After not getting any resolution on the issue from Mr. Behling, Ms. Cope brought this issue to the attention of Relator Dill, the chief human resources officer.

72. In addition to being a member of the Executive Management Team, Relator Dill is also a patient of FCS, has a MediPort and had her Port accessed by a Medical Assistant on several occasions.

73. Relator Dill addressed the issue with Mr. Behling and with Todd Schonherz, COO.

74. Both Mr. Behling and Mr. Schonherz stated that they needed Human Resources to develop a plan to handle existing Medical Assistant II's and Medical Assistants who wanted to be promoted to Medical Assistant II's.

75. Relator Dill provided alternative options including grandfathering existing Medical Assistant IIs so as to not demote or decrease their pay, while removing port access from their job responsibilities and working with Regional Directors to add/modify responsibilities to the Medical Assistant II job description to allow for job and promotional increases.

76. No action was taken on this issue by either Mr. Behling or Mr. Schonherz.

77. Relator Dill advised Ms. Lois Poel, Regional Director that she was concerned for her safety and did not want her MediPort to be accessed by a Medical Assistant.

14

78.     Ms. Poel agreed to put an alert on her electronic medical chart indicating that Relator Dill's MediPort was to be accessed by licensed practical nurses (LPNs) and registered nurses (RNs) only.

79.     Relator Dill continued to speak with Mr. Schonherz in the spring and summer of 2015 and again raised the issue of medical assistants accessing patients' surgically implanted Mediports during an Operations Conference Call on June 19, 2015.

80.     Present on the call were Schonherz, Behling and other members of Senior Management..

81.     Mr. Schonherz later advised Relator Dill that FCS was going to cease having medical assistants access patients' surgically implanted Mediports.

82.     A few days later, he informed Relator Dill that **HARWIN**, Managing Partner & President, would not agree to this change.

83.     Relator Dill was informed that **HARWIN** did not feel that medical assistants accessing a patients' surgically implanted Mediports was an issue, and that it would negatively impact **FCS**'s bottom line since a change would cause significant patient flow issues in the clinics, and increase costs if additional LPNs or RNs had to be hired to perform this function.

84.     **HARWIN** later reversed this decision, and sent an email on July 21, 2015 advising that Medical Assistants would no longer be able to access MediPorts and that he was giving clinics up to 90 days to transition to this process.

85.     During at least the past 6 years, the Defendants have submitted hundreds of thousands of claims to Medicare and Medicaid where a medical assistant has illegally accessed patients' surgically implanted Mediports.

15

86.     Medicare and Medicaid regulations do not allow reimbursement to providers where the services billed for were illegally performed.

87.     The Defendants submitted false claims to Medicare and Medicaid by concealing the illegal activities of their medical assistants and then submitting hundreds of thousands of claims to Medicare and Medicaid, which represented that accessing a patient's surgically implanted Mediport was performed by staff permitted to perform such services under State law.

88.     Despite acknowledging that a medical assistant accessing a patient's surgically implanted Mediport was illegal in the State of Florida, the Defendants' have knowingly retained Medicare and Medicaid reimbursement monies that were fraudulently obtained.

89.     Despite knowledge of the falsity of their claims to Medicare and Medicaid for their medical assistants illegally accessing patients' surgically implanted Mediports, the Defendants have refused to disgorge their ill begotten gains.

90.     For each port access, the Defendants submit claims to Medicare and Medicaid that result in reimbursement to the Defendants at the rate of approximately $350.00 per Mediport access.

91.     Direct physician supervision means that the physician must be personally present in the room where the services are being provided. It is insufficient for the physician to merely be in the same building.

92.     For all of these services performed by medical assistants, the Defendants do not use bundled billing, but instead bill for each discrete service provided.

93.     Thus the Defendants have caused hundreds of thousands of false claims to be submitted to Medicare and Medicaid as they knowingly submitted claims to Medicare and

16

Medicaid for the illegal services of medical assistants and for services knowingly not performed under the requisite <u>direct</u> supervision of a physician.

**B.     Defendants' Fraudulent Submission of Claims to the Program for the Use of Drugs Not Medically Necessary and Fraudulent Diagnosis of "Chronic Kidney Disease" in Patient Charts to Justify the Same.**

94.     From the commencement of Relator Sievert's employment with the Defendants, she gained knowledge of and witnessed the Defendants' submission of false claims to Medicare and Medicaid for the administration of the drug Feraheme to Defendants' patients when the same was not medically necessary, nor warranted.

95.     During Relator Dill's employment with the Defendants, she gained knowledge of the Defendants' submission of false claims to Medicare and Medicaid for the administration of the drug Feraheme to Defendants' patients when the same was not medically necessary, nor warranted.

96.     The FCA prohibits anyone from knowingly presenting, or causing to be presented for payment to third-party payers, including Medicare and Medicaid, false or fraudulent claims for reimbursed drugs or services, claims for items or services not provided as claimed, or claims for medically unnecessary items or services.

97.     Feraheme is a prescription medicine used to treat iron-deficiency anemia in adults with chronic kidney disease (CKD). Iron-deficiency anemia is a condition in which there is a lower than normal number of red blood cells because of too little iron.

98.     **FCS** frequently encounters patients who are anemic due to their chemotherapy treatments. A diagnosis of anemia does not indicate a corollary diagnosis of CKD.

99.     However, CKD only affects approximately 8% of the U.S. population.

17

100.     Common symptoms of CKD include lethargy, difficulty concentrating, loss of appetite, difficulty sleeping, muscle cramping at night, swollen feet and ankles, puffiness around the eyes, dry and itchy skin and frequent urination.

101.     The most common risk factors for CKD are diabetes, high blood pressure, a family history of CKD or if a patient is elderly.

102.     To ascertain a diagnosis of CKD, a physician is to perform tests to calculate the patient's glomerular filtration rate (GFR), perform an ultrasound or CT scan, or perform a kidney biopsy. Without these tests, a diagnosis of CKD would be improper.

103.     Oral iron therapy is currently the first line iron replacement therapy of choice of most physicians in the U.S.

104.     Feraheme, however, is an expensive intravenous iron therapy drug specifically approved by the U.S. Food & Drug Administration (FDA) for use only in adults with iron deficiency anemia in patients with chronic kidney disease.

105.     The FDA has mandated that Feraheme be administered only to patients who require intravenous iron therapy.

106.     Feraheme is in a class of medicines called iron replacement products. It works by replenishing iron so that the body can make more red blood cells that carry oxygen throughout the body.

107.     Feraheme is given as an intravenous infusion by a health care professional in a hospital, outpatient clinic, or medical office, such as **FCS**.

108.     More so than other iron therapy treatments, Medicare currently reimburses for Feraheme at a rate of 104% to 106% of the drug's average selling price. Medicare pays doctors up to 6% more than an average sales price for drugs that are injectable or infused in-office. In

addition, larger practices like **FCS** can get discounts from suppliers that can potentially earn more than the 6% margin. **FCS**'s reimbursement rate for Feraheme was 18.1%.

109.    Feraheme is sold at a price that is substantially higher than other primary, alternative IV iron products.

110.    As such, beginning in or about July 2015, the Defendants, pursuant to **HARWIN**'s explicit direction, restricted all iron therapy drugs and required that all **FCS** physicians use Feraheme due to the financial benefit to **FCS**.

111.    This was notwithstanding the fact that to use Feraheme, it is required that a dual diagnosis of iron deficiency and CKD be present.

112.    After this directive from **HARWIN** was announced, questions began being asked by Relator Sievert's management team and financial counselors.

113.    Specifically, many of the nurses and physicians did not want to use Feraheme on some patients because those patients did not have CKD.

114.    Relator Sievert approached **HARWIN** regarding this issue and his response was that "well, all these patients have at least stage 1 CKD, so tell the physicians to just add it to the patient's chart" as he always had done and that he has had no reimbursement issues. Sarah Cevallos who was the VP of Revenue Cycle (now Chief Revenue Cycle Officer) and Rich Dyson Director of Procurement were present in the room when this was discussed.

115.    As a result, **FCS** used, and continues to use, Feraheme exclusively for all iron therapy treatments, including on patients who do not properly have a diagnosis of CKD as **HARWIN** directed all physicians to simply add CKD because "all these patients have at least Stage 1 CKD." Placing a misdiagnosis of a renal disease in order to try to justify the expensive medication proscribed for anemic patients has been FCS's practice for many years.

116.    However, such diagnoses of CKD are simply false and **FCS** physicians have been instructed to simply add a diagnosis of CKD without performing the necessary tests to calculate the patient's glomerular filtration rate (GFR), performing an ultrasound or CT scan, or performing a kidney biopsy. Without these tests, all diagnoses of CKD are improper and unwarranted.

117.    **HARWIN** has required **FCS** physicians to create fraudulent entries on a patient's chart in order to make the use of Feraheme appear legitimate when it is not.

118.    As a result, the Defendants have, and continue to, knowingly submit thousands of false claims for reimbursement to Medicare and Medicaid since Feraheme is only subject to reimbursement where the patient truly has CKD and anemia.

119.    These claims of the Defendants are false because the patients do not have CKD but such a diagnosis is fraudulently added to the patient's chart so as to represent to Medicare and Medicaid that the use of the expensive Feraheme is appropriate, when in fact it is not.

120.    The use of Feraheme is of great financial benefit to the Defendants.

### C. Defendants' Violation of Federal Anti-Kickback Statute.

121.    In addition to the fraudulent practices described above, Relator Dill and Relator Seivert have knowledge that Defendant **HARWIN** of **FCS** has colluded and conspired with Dr. Daniel **DOSORETZ** of **21C**, in what they called "a gentleman's agreement," in which **21C** will not offer medical oncology to patients in Southwest Florida (Sarasota and Manatee Counties through Collier County to the south) and in return **FCS** will not perform radiation oncology in the same geographical area.

122.    During the Relators' employment, and to date, **21C** does not perform medical oncology services in Southwest Florida (Sarasota and Manatee Counties through Collier County

to the south) and **FCS** does not perform radiation oncology, despite the fact these services are offered outside of Southwest Florida.

123.    This arrangement is illegal because this business practice unreasonably deprives consumers in Southwest Florida of the benefits of competition, resulting in higher prices for oncology products and services, to the benefit of **21C** and **FCS**.

124.    **FCS** does perform radiation oncology, but only outside of Southwest Florida.

125.    **21C** does perform medical oncology, but only outside of Southwest Florida.

126.    **FCS** and **21C** have created an unlawful monopoly because each entity controls the market for a specific product or service, and it has obtained that market power, not because its product or service is superior to others, but by suppressing competition with the anticompetitive conduct described above.

127.    As part of this agreement and/or conspiracy, **FCS** and **21C** agreed to a *quid pro quo* scheme whereby **21C** would exclusively refer its medical oncology patients to **FCS** and, in return, **FCS** would refer its radiation oncology patients exclusively to **21C**.

128.    **FCS** staff members were specifically instructed that any radiation services in Southwest Florida were to be sent exclusively to **21C**.

129.    The Relators, as employees of **FCS**, also observed the *quid pro quo* in action as they observed that **21C** would refer all of their medical oncology patients in Southwest Florida to **FCS**.

130.    Such a practice is an illegal kickback scheme under the FCA since both parties benefit financially from the anticompetitive agreement described above, in which the trading of Medicare and Medicaid patient referrals in medical oncology (to **FCS**) and radiation oncology (to **21C**) is a key term.

131.   In sum, by exclusively referring radiation oncology patients to **21C**, **FCS** receives a kickback in the form of reciprocal referrals from **21C** of medical oncology patients.

132.   Because **21C** and **FCS** have illegally cornered the market and agreed to trade Program patients, patients in Southwest Florida have but one option for medical oncology (**FCS**) or radiation oncology (**21C**).

133.   This illegal practice is further highlighted by the entry, and takeover, of a third party competitor when the third party competitor entered the Southwest Florida market.

134.   In 2011, then-independent and Naples-based Specialists in Urology, P.A. launched "Premiere Oncology," which provided medical oncology, radiation oncology and urology services in Southwest Florida.

135.   However, due to the monopoly created by the "gentlemen's agreement" between **FCS** and **21C**, Premiere Oncology struggled due to a lack of patients.

136.   However, in order to eliminate any competition, **FCS** and **21C** entered into an agreement whereby **21C** would purchase only Premiere Oncology's radiation oncology practice and **FCS** would only purchase Premiere Oncology's medical oncology practice.

137.   This agreement was carried out as **FCS** only bought Premiere Oncology's medical oncology practice and shortly thereafter, or concurrently, **21C** only bought Premiere Oncology's radiation oncology practice.

138.   Relator Dill and Relator Sievert were privy to conversations within **FCS** regarding the agreement between Defendant **HARWIN** (on behalf of **FCS**) and Defendant **DOSORETZ** (on behalf of **21C**) as to how Premiere Oncology was to be carved up between the two entities.

139.    **FCS, 21C, HARWIN** and **DOSORETZ** violated the FCA because, knowing they were ineligible for the payments demanded due to violations of federal Anti-kickback Statutes nonetheless submitted claims for reimbursement to Medicare, Medicaid and other federal government and/or the State of Florida by getting false or fraudulent claims allowed or paid by Medicare, Medicaid and/or other federal and/or state funded health programs.

140.    **FCS, 21C, HARWIN** and **DOSORETZ**'s illegal kickback programs can inflate the costs to federal and state health care programs (Medicare and Medicaid) by causing **FCS's** and **21C's** physicians to overuse or inappropriately use the services of **FCS** and **21C**, as delineated in their "gentlemen's agreement."

141.    By engaging in their illegal kickback scheme, **FCS** and **21C** lock-in lucrative referrals from each other, thus further strengthening their dominance over the oncology market in Southwest Florida.

142.    The Affordable Care Act of 2009 makes such kickbacks *per se* violations of the FCA.

## EMPLOYMENT CLAIMS ALLEGATIONS

### A. Relator Sievert.

143.    Relator Sievert was employed by **FCS** as a vice president clinic financial services.

144.    Relator Sievert began her employment about October 2003.

145.    She had always performed her assigned duties in a professional manner and was very well qualified for her position.

146.    She always received positive performance reviews until she complained of disparate compensation, which disparity was based upon gender.

147.   **FCS** compensates similarly situated male employees, and male employees in general, in a more favorable manner than female members of staff.

148.   Relator Sievert was paid less than her similarly situated male counterparts for the same work.

149.   When Sievert was terminated on or about October 2, 2015, **FCS** presented her with a severance agreement that presented compensation significantly below the amounts offered to separated male employees.

**B. Relator Dill.**

150.   Relator Dill was employed by **FCS** as the chief human resource officer.

151.   She always performed her assigned duties in a professional manner and was very well qualified for her position.

152.   She always received positive performance reviews until she developed a disability and complained of disability discrimination.

153.   Relator Dill is a qualified person with a disability as she has an impairment of the immune/hematological systems, specifically porphyria.

154.   This will occasionally affect the nervous system, skin and other organs, which limits her ability to perform major life activities, including walking and general ability to perform self-care.

155.   Throughout the early part of 2015, Dill requested and was granted reasonable accommodations, including brief leave.

156.   However, **FCS** then used her status as a person with a disability to deny her compensation otherwise earned and deny her other benefits as a direct and proximate result of her reasonable accommodations.

157.   Additionally, when Dill complained of this, **FCS** took no investigative action whatsoever and instead took further adverse action in the form of further denial of compensation and the removal of all authority and the position she held with **FCS**.

158.   **FCS** terminated Dill days after she provided her supervisor with a copy of her initial EEOC Charge of Discrimination.

159.   Even post-termination, **FCS** has continued to retaliate by restricting Dill's ability to communicate with **FCS**, who is also her healthcare provider.

## COUNT I- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(A))**

160.   Relators incorporate by reference the allegations paragraphs 1-120 as if fully set forth in this Count.

161.   From at least 2010 to present, the Defendants violated the FCA, 31 U.S.C. §3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

162.   The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the legal status of a medical assistant to perform services on and access patients' surgically implanted Mediport, and (b) the claims contained false and fraudulent information regarding diagnoses of patients having Stage I CKD in order to exclusively use the expensive Feraheme. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

163.    The monies the Defendants obtained through its false or fraudulent submissions to the Program were provided in whole or in part by the United States.

164.    The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

165.    The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

166.    The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

167.    By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relators respectfully request this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1)    Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

2)    A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the United States;

3)    Prejudgment Interest;

4)       All costs incurred in bringing this action.

To the Relators:

1) The maximum amount allowed pursuant to §3730(d) of the FCA and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

## COUNT II- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(B)**

168.    Relators incorporate by reference the allegations paragraphs 1-120 as if fully set forth in this Count.

169.    From at least 2010 to present, the Defendants violated the FCA, 31 U.S.C. §3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

170.    The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the legal status of a medical assistant to perform services on and access patients' surgically implanted Mediport, (b) the claims contained false and fraudulent information regarding diagnoses of patients having Stage I CKD in order to exclusively use the expensive Feraheme, and (c) the claims originated from illegal kickbacks thus disqualifying the Defendants

from receiving Program monies. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

171.    The monies the Defendants obtained through its false or fraudulent submissions to the Program were provided in whole or in part by the United States.

172.    The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

173.    The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

174.    The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

175.    By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relators respectfully request this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1) Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

2) A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the United States;

3) Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relators:

1) The maximum amount allowed pursuant to §3730(d) of the FCA and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

## COUNT III- VIOLATIONS OF THE FEDERAL ANTI-KICKBACK STATUTE
### 42 U.S.C. §1320A-7B(B)

176.    Relator incorporates by reference the allegations paragraphs 1-47 and 121-142 as if fully set forth in this Count.

177.    The "gentlemen's agreement" between **HARWIN** and **DOSORETZ**, on behalf of **FCS** and **21C**, violates the federal Anti-Kickback Statute because the exclusive referral arrangement constitutes the receipt of remuneration offered to induce, or in return for, the referral of patients paid for by Government Programs, including Medicare and Medicaid.

178.    **FCS** and **21C** made excessive referrals of Program patients to each other as a financial inducement for patient referrals, which services were then paid for by Government Programs, including Medicare and Medicaid, in violation of the Anti-Kickback Statute.

179.   None of these referrals for the inducement of patient referrals are protected under the existing "safe harbor" regulations.

180.   **FCS** and **21C** have paid millions of dollars to each other in the form of exclusive patient referrals in order to secure their individual monopolies in Southwest Florida of medical oncology (**FCS**) and radiation oncology (**21C**).

181.   For each of these Anti-Kickback Statute violations, **FCS, HARWIN, 21C** and **DOSORETZ** are subject to penalties of up to $50,000.00 for each improper act, plus damages of up to three times the amount of the improper remuneration at issue.

WHEREFORE, the Relator respectfully requests this Court to award the following damages:

1)   Judgment against the Defendants in an amount equal to up to three times the amount of the improper remuneration at issue;

2)   A civil penalty of up to $50,000.00 for each kickback violation

3)   Attorney's fees and costs;

4)   Such other relief as the Court deems just and appropriate.

## COUNT IV- DEFENDANT'S VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

182.   Relator incorporates by reference the allegations in paragraphs 1-142 as if fully set forth in this paragraph.

183.   This is a *qui tam* action brought by the Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*

184.   Fla. Stat. §68.082(2) provides liability for any person who:

(a)   Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

30

(b)  Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

185.    From at least 2010 to present, the Defendants violated the Florida FCA (FFCA) Fla. Stat. §68.082(2) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the State of Florida.

186.    From at least 2010 to present, the Defendants violated the FFCA, Fla. Stat. §68.082(2)(b) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be made or used a false record or statement material to a false or fraudulent claim paid or approved by an agency.

187.    The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the legal status of a medical assistant to perform services on and access patients' surgically implanted Mediport, (b) the claims contained false and fraudulent information regarding diagnoses of patients having Stage I CKD in order to exclusively use the expensive Feraheme, and (c) the claims originated from illegal kickbacks thus disqualifying the Defendants from receiving Program monies. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

188.    The claims violated the FFCA because they were also the product of an illegal kickback scheme, in violation of Florida law, whereby **FCS** would exclusively refer radiation oncology patients to **21C** in order to receive a kickback in the form of exclusive referrals from **21C** of its medical oncology patients.

31

189.    The claims violated the FFCA because they were also the product of an illegal kickback scheme, in violation of Florida law, whereby **21C** would exclusively refer medical oncology patients to **FCS** in order to receive a kickback in the form of exclusive referrals from **FCS** of its radiation oncology patients.

190.    The monies the Defendants obtained through their false or fraudulent submissions to the Program were provided in whole or in part by the State of Florida.

191.    The State of Florida was unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

192.    The State of Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

193.    Compliance with applicable Medicare, Medicaid and the various other federal and states laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida by the Defendants. Compliance with applicable Florida statutes/regulations was also an express condition of payment of claims submitted to the State of Florida.

194.    Had the State of Florida known that the false representations were made by the Defendants, it would not have paid the claims.

195.    As a result of the Defendants' violations of Fla. Stat. §68.082(2), the State of Florida has been damaged.

196.    Relators have direct and independent knowledge of the allegations of this Complaint and has brought this action pursuant to Fla. Stat. §68.083(2) on behalf of themselves and the State of Florida.

WHEREFORE, the Relators respectfully request this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1) Three times the amount of actual damages which the State of Florida has sustained as a result of the Defendants' conduct;

2) A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the State of Florida;

3) Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relators:

1) The maximum amount allowed pursuant to Fla. Stat. §68.085 and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

## COUNT V – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, GENDER DISCRIMINATION- SIEVERT

197.    Plaintiff incorporates by reference Paragraphs 5, 9-11, 13, 15-16 and 143-149 of this Complaint as though fully set forth below.

198.   **SIEVERT** is a female and as such, is a member of a protected class.

199.   At all material times, **SIEVERT** was an employee and **FCS** was her employer covered by and within the meaning of Title VII of the Civil Rights Act of 1963, 42 U.S.C §2000e.

200.   **SIEVERT** was, and is, qualified for the positions that she held with **FCS**.

201.   **SIEVERT** was subjected to disparate treatment by **FCS**, thereby altering the terms and conditions of her employment.

202.   The acts, failures to act, practices and policies of **FCS** set forth above constitute intentional discrimination on the basis of **SIEVERT**'s sex in violation of Section 703 of Title VII, 42 U.S.C. § 2000e-2.

203.   As a direct and proximate result of the violations of 42 U.S.C. § 2000e et seq. as referenced and cited herein, **SIEVERT** has lost benefits and privileges of her employment and has been substantially and significantly injured in her career path.

204.   As a direct and proximate result of the violations of 42 U.S.C. § 2000e et seq. as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **SIEVERT** is entitled to all relief necessary to make her whole as provided for under 42 USC § 2000e et seq.

205.   As a direct and proximate result of **FCS**'s actions, **SIEVERT** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

206.   **SIEVERT** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE,** Plaintiff requests trial by jury of all issues so triable as of right, and:

i.        Injunctive relief directing Defendant to cease and desist from all gender discrimination;

ii.      Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had she maintained her position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.      Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv.      Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.       Declaratory relief declaring the acts and practices of Defendant to be in violation of the statute cited above;

vi.      Reasonable attorney's fees plus costs;

vii.     Compensatory damages;

viii.    Punitive damages, and;

ix.      Such other relief as this Court shall deem appropriate.

## COUNT VI – VIOLATION OF TITLE VII OF THE FLORIDA CIVIL RIGHTS ACT, GENDER DISCRIMINATION- SIEVERT

207.     Plaintiff incorporates by reference Paragraphs 5, 9-11, 13, 15-16 and 143-149 of this Complaint as though fully set forth below.

208.     **SIEVERT** is a female and as such, is a member of a protected class.

209.     At all material times, **SIEVERT** was an employee and **FCS** was her employer covered by and within the meaning of the FCRA.

210.     **SIEVERT** was, and is, qualified for the positions that she held with **FCS**.

211.   **SIEVERT** was subjected to disparate treatment while employed with **FCS**, thereby altering the terms and conditions of her employment.

212.   The acts, failures to act, practices and policies of **FCS** set forth above constitute intentional discrimination on the basis of **SIEVERT**'s sex in violation of the FCRA.

213.   As a direct and proximate result of the violations of the FCRA as referenced and cited herein, **SIEVERT** has lost benefits and privileges of her employment and has been substantially and significantly injured in her career path.

214.   As a direct and proximate result of the violations of the FCRA as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **SIEVERT** is entitled to all relief necessary to make her whole as provided for under the FCRA.

215.   As a direct and proximate result of **FCS**'s actions, **SIEVERT** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

216.   **SIEVERT** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.      Injunctive relief directing Defendant to cease and desist from all gender discrimination;

ii.     Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had she maintained her position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.   Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv.   Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.   Declaratory relief declaring the acts and practices of Defendant to be in violation of the statute cited above;

vi.   Reasonable attorney's fees plus costs;

vii.   Compensatory damages;

viii.   Punitive damages, and;

ix.   Such other relief as this Court shall deem appropriate.

### COUNT VII – VIOLATION OF TITLE VII- RETALIATION- SIEVERT

217.   Plaintiff incorporates by reference Paragraphs 5, 9-11, 13, 15-16 and 143-149 of this Complaint as though fully set forth below.

218.   **SIEVERT** is a person with a female person and, as such, is a member of a protected class.

219.   At all material times, **SIEVERT** was an employee and **FCS** was her employer covered by and within the meaning of Title VII.

220.   **SIEVERT** was qualified for the positions that she held with **FCS**.

221.   Following **SIEVERT**'s objection to gender discrimination, **FCS** retaliated by altering the terms and conditions of her employment and terminating **SIEVERT**'s employment.

222.   **SIEVERT**'s objection to gender discrimination constitute a protected activity because such requests were in furtherance of rights secured to her by law.

223.   Said protected activity was the proximate cause of **FCS**'s negative employment actions against **SIEVERT** including changed working conditions, discipline, and ultimately termination.

224.   Instead of rectifying the disparate pay based upon gender, **FCS** retaliated against **SIEVERT** via changed working conditions, discipline, and termination.

225.   The acts, failures to act, practices and policies of **FCS** set forth above constitute retaliation in violation of the Title VII.

226.   As a direct and proximate result of the violations of the Title VII, as referenced and cited herein, **SIEVERT** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path.

227.   As a direct and proximate result of the violations of the Title VII, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **SIEVERT** is entitled to all relief necessary to make her whole as provided for under Title VII

228.   As a direct and proximate result of **FCS**'s actions, **SIEVERT** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

229.   **SIEVERT** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.   Injunctive relief directing Defendant to cease and desist from all retaliation against employees who engage in statutorily protected acts;

ii.     Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had he maintained his position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.    Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv.     Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of the Defendant's actions;

v.      Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statute cited above;

vi.     Reasonable attorney's fees plus costs;

vii.    Compensatory damages;

viii.   Punitive damages, and;

ix.     Such other relief as this Court shall deem appropriate.

## COUNT VIII – VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992- RETALIATION- SIEVERT

230.    Plaintiff incorporates by reference Paragraphs 5, 9-11, 13, 15-16 and 143-149 of this Complaint as though fully set forth below.

231.    **SIEVERT** is a person with a female person and, as such, is a member of a protected class.

232.    At all material times, **SIEVERT** was an employee and **FCS** was her employer covered by and within the meaning of the FCRA.

233.    **SIEVERT** was qualified for the positions that she held with **FCS**.

234.     Following **SIEVERT**'s objection to gender discrimination, **FCS** retaliated by altering the terms and conditions of her employment and terminating **SIEVERT**'s employment.

235.     **SIEVERT**'s objection to gender discrimination constitutes a protected activity because such requests were in furtherance of rights secured to her by law.

236.     Said protected activity was the proximate cause of **FCS**'s negative employment actions against **SIEVERT** including changed working conditions, discipline, and ultimately termination.

237.     Instead of rectifying the disparate pay based upon gender, **FCS** retaliated against **SIEVERT** via changed working conditions, discipline, and termination.

238.     The acts, failures to act, practices and policies of **FCS** set forth above constitute retaliation in violation of the FCRA.

239.     As a direct and proximate result of the violations of the FCRA, as referenced and cited herein, **SIEVERT** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path.

240.     As a direct and proximate result of the violations of the FCRA, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **SIEVERT** is entitled to all relief necessary to make her whole as provided for under the FCRA.

241.     As a direct and proximate result of **FCS**'s actions, **SIEVERT** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

242.     **SIEVERT** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE,** Plaintiff requests trial by jury of all issues so triable as of right, and:

i.      Injunctive relief directing the Defendant to cease and desist from all retaliation against employees who engage in statutorily protected acts;

ii.      Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had he maintained his position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.      Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv.      Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.      Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statute cited above;

vi.      Reasonable attorney's fees plus costs;

vii.      Compensatory damages;

viii.      Punitive damages, and;

ix.      Such other relief as this Court shall deem appropriate.

## COUNT IX – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, AS AMENDED- DILL

243.      Plaintiff incorporates by reference Paragraphs 5, 9-12, 14, 16 and 150-159 of this Complaint as though fully set forth below.

244.      At all relevant times, **DILL** was an individual with a disability within the meaning of the ADAAA.

245.     Specifically, **DILL** has physical impairments that substantially limit one or more of her major life activities and bodily functions, has a record of the impairment, and is regarded by **FCS** as having such impairments.

246.     **DILL** is a qualified individual with disabilities as that term is defined in the ADAAA.

247.     **DILL** is an individual who, with reasonable accommodation, at all relevant times could perform the essential functions of her jobs with **FCS**.

248.     At all material times, **DILL** was an employee and **FCS** was her employer covered by and within the meaning of the ADAAA.

249.     **FCS** was made aware and was aware of **DILL**'s disabilities, which qualify under the ADAAA.

250.     **FCS** discriminated against **DILL** with respect to her terms, conditions, and privileges of employment because of her disabilities.

251.     **FCS** conducted itself with malice or with reckless indifference to **DILL**'s federally protected rights.

252.     **FCS** discriminated against **DILL** in violation of the ADAAA by interfering with her enjoyment of all benefits, privileges, terms, and conditions of her employment.

253.     The conduct of **FCS** altered the terms and conditions of **DILL**'s employment and **DILL** suffered negative employment action in the form of discipline and termination.

254.     As a direct and proximate result of the violations of the ADAAA, as referenced and cited herein, **DILL** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path that was anticipated from her employment.

255.    As a direct and proximate result of the violations of the ADAAA as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **DILL** is entitled to all relief necessary to make her whole.

256.    As a direct and proximate result of **FCS's** actions, **DILL** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

257.    **DILL** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE,** Plaintiff requests trial by jury of all issues so triable as of right, and:

i.      Injunctive relief directing the Defendant to cease and desist from all disability discrimination of all employees;

ii.     Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had he maintained his position with Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.    Front pay, including benefits, insurance costs, benefits costs, and retirement benefits;

iv.     Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.      Declaratory relief declaring the acts and practices of Defendant to be in violation of the statute cited above;

vi.     Reasonable attorney's fees plus costs;

vii.    Compensatory damages;

viii.   Punitive damages, and;

ix.     Such other relief as this Court shall deem appropriate.

## COUNT X – VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT- DISABILITY DISCRIMINATION- DILL

258. Plaintiff incorporates by reference Paragraphs 5, 9-12, 14, 16 and 150-159 of this Complaint as though fully set forth below.

259. At all relevant times, **DILL** was an individual with a disability within the meaning of the FCRA.

260. Specifically, **DILL** has physical impairments that substantially limit one or more of her major life activities and bodily functions, has a record of the impairment, and is regarded by **FCS** as having such impairments.

261. **DILL** is a qualified individual with disabilities as that term is defined in the FCRA.

262. **DILL** is an individual who, with reasonable accommodation, at all relevant times could perform the essential functions of her jobs with **FCS**.

263. At all material times, **DILL** was an employee and **FCS** was her employer covered by and within the meaning of the FCRA.

264. **FCS** was made aware and was aware of **DILL**'s disabilities, which qualify under the FCRA.

265. **FCS** discriminated against **DILL** with respect to her terms, conditions, and privileges of employment because of her disabilities.

266. **FCS** conducted itself with malice or with reckless indifference to **DILL**'s protected rights.

267. **FCS** discriminated against **DILL** in violation of the FCRA by interfering with her enjoyment of all benefits, privileges, terms, and conditions of her employment.

44

268.    The conduct of **FCS** altered the terms and conditions of **DILL**'s employment and **DILL** suffered negative employment action in the form of discipline and termination.

269.    As a direct and proximate result of the violations of the FCRA, as referenced and cited herein, **DILL** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path that was anticipated from her employment.

270.    As a direct and proximate result of the violations of the FCRA as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **DILL** is entitled to all relief necessary to make her whole.

271.    As a direct and proximate result of **FCS**'s actions, **DILL** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

272.    **DILL** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.      Injunctive relief directing Defendant to cease and desist from all disability discrimination of all employees;

ii.     Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had he maintained his position with Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.    Front pay, including benefits, insurance costs, benefits costs, and retirement benefits;

iv.     Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.      Declaratory relief declaring the acts and practices of Defendant to be in violation of the statute cited above;

vi.     Reasonable attorney's fees plus costs;

vii.    Compensatory damages;

viii.   Punitive damages, and;

ix.     Such other relief as this Court shall deem appropriate.

### COUNT XI – VIOLATION OF THE ADAAA- RETALIATION- DILL

273.    Plaintiff incorporates by reference Paragraphs 5, 9-12, 14, 16 and 150-159 of this Complaint as though fully set forth below.

274.    **DILL** is a person with a disability and, as such, is a member of a protected class.

275.    At all material times, **DILL** was an employee and **FCS** was her employer covered by and within the meaning of the ADAAA.

276.    **DILL** was qualified for the positions that she held with **FCS**.

277.    Following **DILL**'s request for reasonable accommodation and disclosure of her disabilities, **FCS** retaliated by altering the terms and conditions of her employment and terminating **DILL**'s employment.

278.    **DILL**'s requests for leave and disclosure of her disabilities constitute a protected activity because such requests were in furtherance of rights secured to her by law.

279.    Said protected activity was the proximate cause of **FCS**'s negative employment actions against **DILL** including changed working conditions, discipline, and ultimately termination.

280.    Instead of granting reasonable accommodations and accepting her as a qualified person with a disability, **FCS** retaliated against **DILL** via changed working conditions, discipline, and termination.

281.    The acts, failures to act, practices and policies of **FCS** set forth above constitute retaliation in violation of the ADAAA.

282.    As a direct and proximate result of the violations of the ADAAA, as referenced and cited herein, **DILL** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path.

283.    As a direct and proximate result of the violations of the ADAAA, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **DILL** is entitled to all relief necessary to make her whole as provided for under the ADAAA.

284.    As a direct and proximate result of **FCS's** actions, **DILL** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

285.    **DILL** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.    Injunctive relief directing Defendant to cease and desist from all retaliation against employees who engage in statutorily protected acts;

ii.    Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had he maintained

his position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii. Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv. Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of the Defendant's actions;

v. Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statute cited above;

vi. Reasonable attorney's fees plus costs;

vii. Compensatory damages;

viii. Punitive damages, and;

ix. Such other relief as this Court shall deem appropriate.

## COUNT XII – VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992-RETALIATION- DILL

286. Plaintiff incorporates by reference Paragraphs 5, 9-12, 14, 16 and 150-159 of this Complaint as though fully set forth below.

287. **DILL** is a person with a disability and, as such, is a member of a protected class.

288. At all material times, **DILL** was an employee and **FCS** was her employer covered by and within the meaning of the FCRA.

289. **DILL** was qualified for the positions that she held with **FCS**.

290. Following **DILL**'s request for reasonable accommodation and disclosure of her disabilities, **FCS** retaliated by altering the terms and conditions of her employment and terminating **DILL**'s employment.

291. **DILL**'s requests for leave and disclosure of her disabilities constitute a protected activity because such requests were in furtherance of rights secured to her by law.

292. Said protected activity was the proximate cause of **FCS**'s negative employment actions against **DILL** including changed working conditions, discipline, and ultimately termination.

293. Instead of granting reasonable accommodations and accepting her as a qualified person with a disability, **FCS** retaliated against **DILL** via changed working conditions, discipline, and termination.

294. The acts, failures to act, practices and policies of **FCS** set forth above constitute retaliation in violation of the FCRA.

295. As a direct and proximate result of the violations of the FCRA, as referenced and cited herein, **DILL** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path.

296. As a direct and proximate result of the violations of the FCRA, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **DILL** is entitled to all relief necessary to make her whole as provided for under the ADAAA.

297. As a direct and proximate result of **FCS**'s actions, **DILL** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

298. **DILL** has exhausted her administrative remedies and this count is timely brought.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.  Injunctive relief directing the Defendant to cease and desist from all retaliation against employees who engage in statutorily protected acts;

ii.  Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had he maintained his position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.  Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv.  Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.  Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statute cited above;

vi.  Reasonable attorney's fees plus costs;

vii.  Compensatory damages;

viii.  Punitive damages, and;

ix.  Such other relief as this Court shall deem appropriate.

Respectfully submitted,

Dated: December 19, 2016

Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Relators
YORMAK EMPLOYMENT & DISABILITY LAW
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Sharon Dill<br>5619 Shaddelee Lane W<br>Fort Myers, FL 33919 | From: | Miami District Office<br>Miami Tower, 100 S E 2nd Street<br>Suite 1500<br>Miami, FL 33131 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 510-2016-01004 | Pablo Alfonso,<br>Investigator | (305) 808-1744 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

━━━━ **MICHAEL J. FARRELL,**
**District Director**

**NOV 28 2016**

*(Date Mailed)*

Enclosures(s)

cc:    Tom Clark, General Counsel
**FLORIDA CANCER SPECIALISTS**
4371 Veronica S. Shoemaker Blvd.
Fort Myers, FL 33916

Benjamin H. Yormak, Esquire
9990 Coconut Road
Bonita Springs, FL 34135

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

<u>**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**</u>

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"** now include the operation of major bodily functions, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➢ **Only one** major life activity need be substantially limited.

➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:  Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*   For more information, consult the amended regulations and appendix, as well as explanatory publications, available at <u>http://www.eeoc.gov/laws/types/disability_regulations.cfm</u>.